(Slip Opinion)     OCTOBER TERM, 2010                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AMERICAN ELECTRIC POWER CO., INC., ET AL. *v.* CONNECTICUT ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 10–174.   Argued April 19, 2011—Decided June 20, 2011

In *Massachusetts* v. *EPA*, 549 U. S. 497, this Court held that the Clean
Air Act authorizes federal regulation of emissions of carbon dioxide
and other greenhouse gases, and that the Environmental Protection
Agency (EPA) had misread that Act when it denied a rulemaking pe-
tition seeking controls on greenhouse gas emissions from new motor
vehicles.  In response, EPA commenced a rulemaking under §111 of
the Act, 42 U. S. C. §7411, to set limits on greenhouse gas emissions
from new, modified, and existing fossil-fuel fired power plants.  Pur-
suant to a settlement finalized in March 2011, EPA has committed to
issuing a final rule by May 2012.

The lawsuits considered here began well before EPA initiated ef-
forts to regulate greenhouse gases.  Two groups of plaintiffs, respon-
dents here, filed separate complaints in a Federal District Court
against the same five major electric power companies, petitioners
here.  One group of plaintiffs included eight States and New York
City; the second joined three nonprofit land trusts.  According to the
complaint, the defendants are the largest emitters of carbon dioxide
in the Nation.  By contributing to global warming, the plaintiffs as-
serted, the defendants' emissions substantially and unreasonably in-
terfered with public rights, in violation of the federal common law of
interstate nuisance, or, in the alternative, of state tort law.  All plain-
tiffs ask for a decree setting carbon-dioxide emissions for each defen-
dant at an initial cap, to be further reduced annually.

The District Court dismissed both suits as presenting nonjusticia-
ble political questions, but the Second Circuit reversed.  On the
threshold questions, the Circuit held that the suits were not barred
by the political question doctrine and that the plaintiffs had ade-

quately alleged Article III standing.   On the merits, the court held
that the plaintiffs had stated a claim under the "federal common law
of nuisance," relying on this Court's decisions holding that States
may maintain suits to abate air and water pollution produced by
other States or by out-of-state industry, see, *e.g.*, *Illinois* v. *Milwau-
kee*, 406 U. S. 91, 93 *(Milwaukee I)*.  The court further determined
that the Clean Air Act did not "displace" federal common law.

*Held*:

   1. The Second Circuit's exercise of jurisdiction is affirmed by an
equally divided Court.  P. 6.

   2. The Clean Air Act and the EPA action the Act authorizes dis-
place any federal common-law right to seek abatement of carbon-
dioxide emissions from fossil-fuel fired power plants.  Pp. 6–16.

      (a) Since *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 78, recognized
that there "is no federal general common law," a new federal common
law has emerged for subjects of national concern.   When dealing
"with air and water in their ambient or interstate aspects, there is a
federal common law." *Milwaukee I,* 406 U. S., at 103.  Decisions of
this Court predating *Erie*, but compatible with the emerging distinc-
tion between general common law and the new federal common law,
have approved federal common-law suits brought by one State to
abate pollution emanating from another State.  See, *e.g.*, *Missouri* v.
*Illinois*, 180 U. S. 208, 241–243.  The plaintiffs contend that their
right to maintain this suit follows from such cases.  But recognition
that a subject is meet for federal law governance does not necessarily
mean that federal courts should create the controlling law.   The
Court need not address the question whether, absent the Clean Air
Act and the EPA actions it authorizes, the plaintiffs could state a
federal common-law claim for curtailment of greenhouse gas emis-
sions because of their contribution to global warming.   Any such
claim would be displaced by the federal legislation authorizing EPA
to regulate carbon-dioxide emissions.  Pp. 6–9.

      (b) "[W]hen Congress addresses a question previously governed
by a decision rested on federal common law the need for such an un-
usual exercise of law-making by federal courts disappears." *Milwau-
kee* v. *Illinois*, 451 U. S. 304, 314 *(Milwaukee II)*.  Legislative dis-
placement of federal common law does not require the "same sort of
evidence of a clear and manifest [congressional] purpose" demanded
for preemption of state law. *Id.*, at 317.  Rather, the test is simply
whether the statute "speak[s] directly to [the] question" at issue.
*Mobil Oil Corp.* v. *Higginbotham*, 436 U. S. 618, 625.  Here, *Massa-
chusetts* made plain that emissions of carbon dioxide qualify as air
pollution subject to regulation under the Clean Air Act.  549 U. S., at
528–529.  And it is equally plain that the Act "speaks directly" to

emissions of carbon dioxide from the defendants' plants. The Act directs EPA to establish emissions standards for categories of stationary sources that, "in [the Administrator's] judgment," "caus[e], or contribut[e] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." §7411(b)(1)(A). Once EPA lists a category, it must establish performance standards for emission of pollutants from new or modified sources within that category, §7411(b)(1)(B), and, most relevant here, must regulate existing sources within the same category, §7411(d). The Act also provides multiple avenues for enforcement. If EPA does not *set* emissions limits for a particular pollutant or source of pollution, States and private parties may petition for a rulemaking on the matter, and EPA's response will be reviewable in federal court. See §7607(b)(1). The Act itself thus provides a means to seek limits on emissions of carbon dioxide from domestic power plants—the same relief the plaintiffs seek by invoking federal common law. There is no room for a parallel track. Pp. 9–11.

(c) The Court rejects the plaintiffs' argument, and the Second Circuit's holding, that federal common law is not displaced until EPA actually exercises its regulatory authority by setting emissions standards for the defendants' plants. The relevant question for displacement purposes is "whether the field has been occupied, not whether it has been occupied in a particular manner." *Milwaukee II,* 451 U. S., at 324. The Clean Air Act is no less an exercise of the Legislature's "considered judgment" concerning air pollution regulation because it permits emissions until EPA acts. The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from power plants; the delegation displaces federal common law. If the plaintiffs in this case are dissatisfied with the outcome of EPA's forthcoming rulemaking, their recourse is to seek Court of Appeals review, and, ultimately, to petition for certiorari.

The Act's prescribed order of decisionmaking—first by the expert agency, and then by federal judges—is yet another reason to resist setting emissions standards by judicial decree under federal tort law. The appropriate amount of regulation in a particular greenhouse gas-producing sector requires informed assessment of competing interests. The Clean Air Act entrusts such complex balancing to EPA in the first instance, in combination with state regulators. The expert agency is surely better equipped to do the job than federal judges, who lack the scientific, economic, and technological resources an agency can utilize in coping with issues of this order. The plaintiffs' proposal to have federal judges determine, in the first instance, what amount of carbon-dioxide emissions is "unreasonable" and what level of reduction is necessary cannot be reconciled with Congress' scheme.

Pp. 12–15.

(d) The plaintiffs also sought relief under state nuisance law. The Second Circuit did not reach those claims because it held that federal common law governed. In light of the holding here that the Clean Air Act displaces federal common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act. Because none of the parties have briefed preemption or otherwise addressed the availability of a claim under state nuisance law, the matter is left for consideration on remand. Pp. 15–16.

582 F. 3d 309, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, BREYER, and KAGAN, JJ., joined. ALITO, J., filed an opinion concurring in part and concurring in the judgment, in which THOMAS, J., joined. SOTOMAYOR, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–174

AMERICAN ELECTRIC POWER COMPANY, INC., ET AL., PETITIONERS *v.* CONNECTICUT ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 20, 2011]

JUSTICE GINSBURG delivered the opinion of the Court.

We address in this opinion the question whether the plaintiffs (several States, the city of New York, and three private land trusts) can maintain federal common law public nuisance claims against carbon-dioxide emitters (four private power companies and the federal Tennessee Valley Authority). As relief, the plaintiffs ask for a decree setting carbon-dioxide emissions for each defendant at an initial cap, to be further reduced annually. The Clean Air Act and the Environmental Protection Agency action the Act authorizes, we hold, displace the claims the plaintiffs seek to pursue.

I

In *Massachusetts* v. *EPA*, 549 U. S. 497 (2007), this Court held that the Clean Air Act, 42 U. S. C. §7401 *et seq.*, authorizes federal regulation of emissions of carbon dioxide and other greenhouse gases. "[N]aturally present in the atmosphere and . . . also emitted by human activities," greenhouse gases are so named because they "trap . . . heat that would otherwise escape from the [Earth's] atmosphere, and thus form the greenhouse effect that

helps keep the Earth warm enough for life." 74 Fed. Reg. 66499 (2009).[1]  *Massachusetts* held that the Environmental Protection Agency (EPA) had misread the Clean Air Act when it denied a rulemaking petition seeking controls on greenhouse gas emissions from new motor vehicles. 549 U. S., at 510–511. Greenhouse gases, we determined, qualify as "air pollutant[s]" within the meaning of the governing Clean Air Act provision, *id.*, at 528–529 (quoting §7602(g)); they are therefore within EPA's regulatory ken. Because EPA had authority to set greenhouse gas emission standards and had offered no "reasoned explanation" for failing to do so, we concluded that the agency had not acted "in accordance with law" when it denied the requested rulemaking. *Id.*, at 534–535 (quoting §7607(d)(9)(A)).

Responding to our decision in *Massachusetts*, EPA undertook greenhouse gas regulation. In December 2009, the agency concluded that greenhouse gas emissions from motor vehicles "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare," the Act's regulatory trigger. §7521(a)(1); 74 Fed. Reg. 66496. The agency observed that "atmospheric greenhouse gas concentrations are now at elevated and essentially unprecedented levels," almost entirely "due to anthropogenic emissions," *id.*, at 66517; mean global temperatures, the agency continued, demonstrate an "unambiguous warming trend over the last 100 years," and particularly "over the past 30 years," *ibid.* Acknowledging that not all scientists agreed on the causes and consequences of the rise in global temperatures, *id.*, at 66506, 66518, 66523–66524, EPA concluded that "compelling" evidence supported the "attribution of observed

─────────────

[1] In addition to carbon dioxide, the primary greenhouse gases emitted by human activities include methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. 74 Fed. Reg. 66499.

climate change to anthropogenic" emissions of greenhouse gases, *id.*, at 66518. Consequent dangers of greenhouse gas emissions, EPA determined, included increases in heat-related deaths; coastal inundation and erosion caused by melting icecaps and rising sea levels; more frequent and intense hurricanes, floods, and other "extreme weather events" that cause death and destroy infrastructure; drought due to reductions in mountain snow-pack and shifting precipitation patterns; destruction of ecosystems supporting animals and plants; and potentially "significant disruptions" of food production. *Id.*, at 66524–66535.[2]

EPA and the Department of Transportation subsequently issued a joint final rule regulating emissions from light-duty vehicles, see 75 Fed. Reg. 25324 (2010), and initiated a joint rulemaking covering medium- and heavy-duty vehicles, see *id.*, at 74152. EPA also began phasing in requirements that new or modified "[m]ajor [greenhouse gas] emitting facilities" use the "best available control technology." §7475(a)(4); 75 Fed. Reg. 31520–31521. Finally, EPA commenced a rulemaking under §111 of the Act, 42 U. S. C. §7411, to set limits on greenhouse gas emissions from new, modified, and existing fossil-fuel fired power plants. Pursuant to a settlement finalized in March 2011, EPA has committed to issuing a proposed rule by July 2011, and a final rule by May 2012. See 75 Fed. Reg. 82392; Reply Brief for Tennessee Valley Authority 18.

## II

The lawsuits we consider here began well before EPA initiated the efforts to regulate greenhouse gases just described. In July 2004, two groups of plaintiffs filed

––––––––––

[2] For views opposing EPA's, see, *e.g.*, Dawidoff, The Civil Heretic, N. Y. Times Magazine 32 (March 29, 2009). The Court, we caution, endorses no particular view of the complicated issues related to carbon-dioxide emissions and climate change.

separate complaints in the Southern District of New York against the same five major electric power companies. The first group of plaintiffs included eight States[3] and New York City, the second joined three nonprofit land trusts[4]; both groups are respondents here. The defendants, now petitioners, are four private companies[5] and the Tennessee Valley Authority, a federally owned corporation that operates fossil-fuel fired power plants in several States. According to the complaints, the defendants "are the five largest emitters of carbon dioxide in the United States." App. 57, 118. Their collective annual emissions of 650 million tons constitute 25 percent of emissions from the domestic electric power sector, 10 percent of emissions from all domestic human activities, *ibid.*, and 2.5 percent of all anthropogenic emissions worldwide, App. to Pet. for Cert. 72a.

By contributing to global warming, the plaintiffs asserted, the defendants' carbon-dioxide emissions created a "substantial and unreasonable interference with public rights," in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law. App. 103–105, 145–147. The States and New York City alleged that public lands, infrastructure, and health were at risk from climate change. App. 88–93. The trusts urged that climate change would destroy habitats for animals and rare species of trees and plants on land the trusts owned and conserved. App. 139–145. All plaintiffs sought injunctive relief requiring each defendant "to cap

---

[3] California, Connecticut, Iowa, New Jersey, New York, Rhode Island, Vermont, and Wisconsin, although New Jersey and Wisconsin are no longer participating. Brief for Respondents Connecticut et al. 3, n. 1.

[4] Open Space Institute, Inc., Open Space Conservancy, Inc., and Audubon Society of New Hampshire.

[5] American Electric Power Company, Inc. (and a wholly owned subsidiary), Southern Company, Xcel Energy Inc., and Cinergy Corporation.

its carbon dioxide emissions and then reduce them by a specified percentage each year for at least a decade." App. 110, 153.

The District Court dismissed both suits as presenting non-justiciable political questions, citing *Baker* v. *Carr*, 369 U. S. 186 (1962), but the Second Circuit reversed, 582 F. 3d 309 (2009). On the threshold questions, the Court of Appeals held that the suits were not barred by the political question doctrine, *id.*, at 332, and that the plaintiffs had adequately alleged Article III standing, *id.*, at 349.

Turning to the merits, the Second Circuit held that all plaintiffs had stated a claim under the "federal common law of nuisance." *Id.*, at 358, 371. For this determination, the court relied dominantly on a series of this Court's decisions holding that States may maintain suits to abate air and water pollution produced by other States or by out-of-state industry. *Id.*, at 350–351; see, *e.g.*, *Illinois* v. *Milwaukee*, 406 U. S. 91, 93, (1972) (*Milwaukee I*) (recognizing right of Illinois to sue in federal district court to abate discharge of sewage into Lake Michigan).

The Court of Appeals further determined that the Clean Air Act did not "displace" federal common law. In *Milwaukee* v. *Illinois*, 451 U. S. 304, 316–319 (1981) (*Milwaukee II*), this Court held that Congress had displaced the federal common law right of action recognized in *Milwaukee I* by adopting amendments to the Clean Water Act, 33 U. S. C. §1251 *et seq.* That legislation installed an all-encompassing regulatory program, supervised by an expert administrative agency, to deal comprehensively with interstate water pollution. The legislation itself prohibited the discharge of pollutants into the waters of the United States without a permit from a proper permitting authority. *Milwaukee II*, 451 U. S., at 310–311 (citing §1311). At the time of the Second Circuit's decision, by contrast, EPA had not yet promulgated any rule regulating greenhouse gases, a fact the court thought dispositive.

582 F. 3d, at 379–381. "Until EPA completes the rulemaking process," the court reasoned, "we cannot speculate as to whether the hypothetical regulation of greenhouse gases under the Clean Air Act would in fact 'spea[k] directly' to the 'particular issue' raised here by Plaintiffs." *Id.*, at 380.

We granted certiorari. 562 U. S. ___ (2010).

## III

The petitioners contend that the federal courts lack authority to adjudicate this case. Four members of the Court would hold that at least some plaintiffs have Article III standing under *Massachusetts*, which permitted a State to challenge EPA's refusal to regulate greenhouse gas emissions, 549 U. S., at 520–526; and, further, that no other threshold obstacle bars review.[6] Four members of the Court, adhering to a dissenting opinion in *Massachusetts*, 549 U. S., at 535, or regarding that decision as distinguishable, would hold that none of the plaintiffs have Article III standing. We therefore affirm, by an equally divided Court, the Second Circuit's exercise of jurisdiction and proceed to the merits. See *Nye* v. *United States*, 313 U. S. 33, 44 (1941).

## IV
### A

"There is no federal general common law," *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 78 (1938), famously recognized. In the wake of *Erie*, however, a keener understanding developed. See generally Friendly, In Praise of *Erie*—And of the New Federal Common Law, 39 N. Y. U. L. Rev. 383

---

[6] In addition to renewing the political question argument made below, the petitioners now assert an additional threshold obstacle: They seek dismissal because of a "prudential" bar to the adjudication of generalized grievances, purportedly distinct from Article III's bar. See Brief for Tennessee Valley Authority 14–24; Brief for Petitioners 30–31.

(1964). *Erie* "le[ft] to the states what ought be left to them," *id.*, at 405, and thus required "federal courts [to] follow state decisions on matters of substantive law appropriately cognizable by the states," *id.*, at 422. *Erie* also sparked "the emergence of a federal decisional law in areas of national concern." *Id.*, at 405. The "new" federal common law addresses "subjects within national legislative power where Congress has so directed" or where the basic scheme of the Constitution so demands. *Id.*, at 408, n. 119, 421–422. Environmental protection is undoubtedly an area "within national legislative power," one in which federal courts may fill in "statutory interstices," and, if necessary, even "fashion federal law." *Id.*, at 421–422. As the Court stated in *Milwaukee I*: "When we deal with air and water in their ambient or interstate aspects, there is a federal common law." 406 U. S., at 103.

Decisions of this Court predating *Erie*, but compatible with the distinction emerging from that decision between "general common law" and "specialized federal common law," Friendly, *supra*, at 405, have approved federal common law suits brought by one State to abate pollution emanating from another State. See, *e.g.*, *Missouri* v. *Illinois*, 180 U. S. 208, 241–243 (1901) (permitting suit by Missouri to enjoin Chicago from discharging untreated sewage into interstate waters); *New Jersey* v. *City of New York*, 283 U. S. 473, 477, 481–483 (1931) (ordering New York City to stop dumping garbage off New Jersey coast); *Georgia* v. *Tennessee Copper Co.*, 240 U. S. 650 (1916) (ordering private copper companies to curtail sulfur-dioxide discharges in Tennessee that caused harm in Georgia). See also *Milwaukee I*, 406 U. S., at 107 (post-*Erie* decision upholding suit by Illinois to abate sewage discharges into Lake Michigan). The plaintiffs contend that their right to maintain this suit follows inexorably from that line of decisions.

Recognition that a subject is meet for federal law gov-

ernance, however, does not necessarily mean that federal courts should create the controlling law. Absent a demonstrated need for a federal rule of decision, the Court has taken "the prudent course" of "adopt[ing] the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation." *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 740 (1979); see *Bank of America Nat. Trust & Sav. Assn.* v. *Parnell*, 352 U. S. 29, 32–34 (1956). And where, as here, borrowing the law of a particular State would be inappropriate, the Court remains mindful that it does not have creative power akin to that vested in Congress. See *Missouri* v. *Illinois*, 200 U. S. 496, 519 (1906) ("fact that this court must decide does not mean, of course, that it takes the place of a legislature"); cf. *United States* v. *Standard Oil Co. of Cal.*, 332 U. S. 301, 308, 314 (1947) (holding that federal law determines whether Government could secure indemnity from a company whose truck injured a United States soldier, but declining to impose such an indemnity absent action by Congress, "the primary and most often the exclusive arbiter of federal fiscal affairs").

In the cases on which the plaintiffs heavily rely, States were permitted to sue to challenge activity harmful to their citizens' health and welfare. We have not yet decided whether private citizens (here, the land trusts) or political subdivisions (New York City) of a State may invoke the federal common law of nuisance to abate out-of-state pollution. Nor have we ever held that a State may sue to abate any and all manner of pollution originating outside its borders.

The defendants argue that considerations of scale and complexity distinguish global warming from the more bounded pollution giving rise to past federal nuisance suits. Greenhouse gases once emitted "become well mixed in the atmosphere," 74 Fed. Reg. 66514; emissions in New Jersey may contribute no more to flooding in New York

than emissions in China. Cf. Brief for Petitioners 18–19. The plaintiffs, on the other hand, contend that an equitable remedy against the largest emitters of carbon dioxide in the United States is in order and not beyond judicial competence. See Brief for Respondents Open Space Institute et al. 32–35. And we have recognized that public nuisance law, like common law generally, adapts to changing scientific and factual circumstances. *Missouri*, 200 U. S., at 522 (adjudicating claim though it did not concern "nuisance of the simple kind that was known to the older common law"); see also *D'Oench, Duhme & Co.* v. *FDIC*, 315 U. S. 447, 472 (1942) (Jackson, J., concurring) ("federal courts are free to apply the traditional common-law technique of decision" when fashioning federal common law).

We need not address the parties' dispute in this regard. For it is an academic question whether, in the absence of the Clean Air Act and the EPA actions the Act authorizes, the plaintiffs could state a federal common law claim for curtailment of greenhouse gas emissions because of their contribution to global warming. Any such claim would be displaced by the federal legislation authorizing EPA to regulate carbon-dioxide emissions.

### B

"[W]hen Congress addresses a question previously governed by a decision rested on federal common law," the Court has explained, "the need for such an unusual exercise of law-making by federal courts disappears." *Milwaukee II*, 451 U. S., at 314 (holding that amendments to the Clean Water Act displaced the nuisance claim recognized in *Milwaukee I*). Legislative displacement of federal common law does not require the "same sort of evidence of a clear and manifest [congressional] purpose" demanded for preemption of state law. *Id.*, at 317. "'[D]ue regard for the presuppositions of our embracing federal system . . . as

a promoter of democracy,'" *id.*, at 316 (quoting *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 243 (1959)), does not enter the calculus, for it is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest. *TVA* v. *Hill*, 437 U. S. 153, 194 (1978). The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute "speak[s] directly to [the] question" at issue. *Mobil Oil Corp.* v. *Higginbotham*, 436 U. S. 618, 625 (1978); see *Milwaukee II*, 451 U. S., at 315; *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226, 236–237 (1985).

We hold that the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants. *Massachusetts* made plain that emissions of carbon dioxide qualify as air pollution subject to regulation under the Act. 549 U. S., at 528–529. And we think it equally plain that the Act "speaks directly" to emissions of carbon dioxide from the defendants' plants.

Section 111 of the Act directs the EPA Administrator to list "categories of stationary sources" that "in [her] judgment . . . caus[e], or contribut[e] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." §7411(b)(1)(A). Once EPA lists a category, the agency must establish standards of performance for emission of pollutants from new or modified sources within that category. §7411(b)(1)(B); see also §7411(a)(2). And, most relevant here, §7411(d) then requires regulation of existing sources within the same category.[7]  For existing sources, EPA issues emissions

_____

[7] There is an exception: EPA may not employ §7411(d) if existing stationary sources of the pollutant in question are regulated under the national ambient air quality standard program, §§7408–7410, or the "hazardous air pollutants" program, §7412. See §7411(d)(1).

guidelines, see 40 C. F. R. §60.22, .23 (2009); in compliance with those guidelines and subject to federal oversight, the States then issue performance standards for stationary sources within their jurisdiction, §7411(d)(1).

The Act provides multiple avenues for enforcement. See *County of Oneida*, 470 U. S., at 237–239 (reach of remedial provisions is important to determination whether statute displaces federal common law). EPA may delegate implementation and enforcement authority to the States, §7411(c)(1), (d)(1), but the agency retains the power to inspect and monitor regulated sources, to impose administrative penalties for noncompliance, and to commence civil actions against polluters in federal court. §§7411(c)(2), (d)(2), 7413, 7414. In specified circumstances, the Act imposes criminal penalties on any person who knowingly violates emissions standards issued under §7411. See §7413(c). And the Act provides for private enforcement. If States (or EPA) fail to enforce emissions limits against regulated sources, the Act permits "any person" to bring a civil enforcement action in federal court. §7604(a).

If EPA does not *set* emissions limits for a particular pollutant or source of pollution, States and private parties may petition for a rulemaking on the matter, and EPA's response will be reviewable in federal court. See §7607(b)(1); *Massachusetts*, 549 U. S., at 516–517, 529. As earlier noted, see *supra*, at 3, EPA is currently engaged in a §7411 rulemaking to set standards for greenhouse gas emissions from fossil-fuel fired power plants. To settle litigation brought under §7607(b) by a group that included the majority of the plaintiffs in this very case, the agency agreed to complete that rulemaking by May 2012. 75 Fed. Reg. 82392. The Act itself thus provides a means to seek limits on emissions of carbon dioxide from domestic power plants—the same relief the plaintiffs seek by invoking federal common law. We see no room for a parallel track.

C

The plaintiffs argue, as the Second Circuit held, that federal common law is not displaced until EPA actually exercises its regulatory authority, *i.e.*, until it sets standards governing emissions from the defendants' plants. We disagree.

The sewage discharges at issue in *Milwaukee II*, we do not overlook, were subject to effluent limits set by EPA; under the displacing statute, "[e]very point source discharge" of water pollution was "prohibited unless covered by a permit." 451 U. S., at 318–320 (emphasis deleted). As *Milwaukee II* made clear, however, the relevant question for purposes of displacement is "whether the field has been occupied, not whether it has been occupied in a particular manner." *Id.*, at 324. Of necessity, Congress selects different regulatory regimes to address different problems. Congress could hardly preemptively prohibit every discharge of carbon dioxide unless covered by a permit. After all, we each emit carbon dioxide merely by breathing.

The Clean Air Act is no less an exercise of the legislature's "considered judgment" concerning the regulation of air pollution because it permits emissions *until* EPA acts. See *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 22, n. 32 (1981) (finding displacement although Congress "allowed some continued dumping of sludge" prior to a certain date). The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from power plants; the delegation is what displaces federal common law. Indeed, were EPA to decline to regulate carbon-dioxide emissions altogether at the conclusion of its ongoing §7411 rulemaking, the federal courts would have no warrant to employ the federal common law of nuisance to upset the agency's expert determination.

EPA's judgment, we hasten to add, would not escape

judicial review. Federal courts, we earlier observed, see *supra*, at 11, can review agency action (or a final rule declining to take action) to ensure compliance with the statute Congress enacted. As we have noted, see *supra*, at 10, the Clean Air Act directs EPA to establish emissions standards for categories of stationary sources that, "in [the Administrator's] judgment," "caus[e], or contribut[e] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." §7411(b)(1)(A). "[T]he use of the word 'judgment,'" we explained in *Massachusetts*, "is not a roving license to ignore the statutory text." 549 U. S., at 533. "It is but a direction to exercise discretion within defined statutory limits." *Ibid.* EPA may not decline to regulate carbon-dioxide emissions from power plants if refusal to act would be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." §7607(d)(9)(A). If the plaintiffs in this case are dissatisfied with the outcome of EPA's forthcoming rulemaking, their recourse under federal law is to seek Court of Appeals review, and, ultimately, to petition for certiorari in this Court.

Indeed, this prescribed order of decisionmaking—the first decider under the Act is the expert administrative agency, the second, federal judges—is yet another reason to resist setting emissions standards by judicial decree under federal tort law. The appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum: as with other questions of national or international policy, informed assessment of competing interests is required. Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance.

The Clean Air Act entrusts such complex balancing to EPA in the first instance, in combination with state regulators. Each "standard of performance" EPA sets must

"tak[e] into account the cost of achieving [emissions] reduction and any nonair quality health and environmental impact and energy requirements." §7411(a)(1), (b)(1)(B), (d)(1); see also 40 C. F. R. §60.24(f) (EPA may permit state plans to deviate from generally applicable emissions standards upon demonstration that costs are "[u]nreasonable"). EPA may "distinguish among classes, types, and sizes" of stationary sources in apportioning responsibility for emissions reductions. §7411(b)(2), (d); see also 40 C. F. R. §60.22(b)(5). And the agency may waive compliance with emission limits to permit a facility to test drive an "innovative technological system" that has "not [yet] been adequately demonstrated." §7411(j)(1)(A). The Act envisions extensive cooperation between federal and state authorities, see §7401(a), (b), generally permitting each State to take the first cut at determining how best to achieve EPA emissions standards within its domain, see §7411(c)(1), (d)(1)–(2).

It is altogether fitting that Congress designated an expert agency, here, EPA, as best suited to serve as primary regulator of greenhouse gas emissions. The expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions. Federal judges lack the scientific, economic, and technological resources an agency can utilize in coping with issues of this order. See generally *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 865–866 (1984). Judges may not commission scientific studies or convene groups of experts for advice, or issue rules under notice-and-comment procedures inviting input by any interested person, or seek the counsel of regulators in the States where the defendants are located. Rather, judges are confined by a record comprising the evidence the parties present. Moreover, federal district judges, sitting as sole adjudicators, lack authority to render precedential decisions binding other judges, even

members of the same court.

Notwithstanding these disabilities, the plaintiffs propose that individual federal judges determine, in the first instance, what amount of carbon-dioxide emissions is "unreasonable," App. 103, 145, and then decide what level of reduction is "practical, feasible and economically viable," App. 58, 119. These determinations would be made for the defendants named in the two lawsuits launched by the plaintiffs. Similar suits could be mounted, counsel for the States and New York City estimated, against "thousands or hundreds or tens" of other defendants fitting the description "large contributors" to carbon-dioxide emissions. Tr. of Oral Arg. 57.

The judgments the plaintiffs would commit to federal judges, in suits that could be filed in any federal district, cannot be reconciled with the decisionmaking scheme Congress enacted. The Second Circuit erred, we hold, in ruling that federal judges may set limits on greenhouse gas emissions in face of a law empowering EPA to set the same limits, subject to judicial review only to ensure against action "arbitrary, capricious, . . . or otherwise not in accordance with law." §7607(d)(9).

## V

The plaintiffs also sought relief under state law, in particular, the law of each State where the defendants operate power plants. See App. 105, 147. The Second Circuit did not reach the state law claims because it held that federal common law governed. 582 F. 3d, at 392; see *International Paper Co.* v. *Ouellette*, 479 U. S. 481, 488 (1987) (if a case "should be resolved by reference to federal common law[,] . . . state common law [is] preempted"). In light of our holding that the Clean Air Act displaces federal common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act. *Id.*, at 489, 491, 497 (holding that the Clean

Water Act does not preclude aggrieved individuals from bringing a "nuisance claim pursuant to the law of the *source* State"). None of the parties have briefed preemption or otherwise addressed the availability of a claim under state nuisance law. We therefore leave the matter open for consideration on remand.

\* \* \*

For the reasons stated, we reverse the judgment of the Second Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOTOMAYOR took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–174

_____

## AMERICAN ELECTRIC POWER COMPANY, INC., ET AL., PETITIONERS *v.* CONNECTICUT ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 20, 2011]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, concurring in part and concurring in the judgment.

I concur in the judgment, and I agree with the Court's displacement analysis on the assumption (which I make for the sake of argument because no party contends otherwise) that the interpretation of the Clean Air Act, 42 U. S. C. §7401 *et seq.*, adopted by the majority in *Massachusetts* v. *EPA*, 549 U. S. 497 (2007), is correct.