Opinion by Judge THOMAS; Concurrence by Judge PRO.
OPINION
THOMAS, Circuit Judge:
The Native Village of Kivalina and the City of Kivalina (collectively “Kivalina”) appeal the district court’s dismissal of their action for damages against multiple oil, energy, and utility companies (collectively “Energy Producers”).[1] Kivalina alleges that massive greenhouse gas emissions emitted by the Energy Producers have resulted in global warming, which, in turn, has severely eroded the land where the City of Kivalina sits and threatens it with imminent destruction. Kivalina seeks damages under a federal common law claim of public nuisance.
The question before us is whether the Clean Air Act, and the Environmental Protection Agency (“EPA”) action that the Act authorizes, displaces Kivalina’s claims. We hold that it does.
I
The City of Kivalina sits on the tip of a six-mile barrier reef on the northwest coast of Alaska, approximately seventy miles north of the Arctic Circle. The city, which was incorporated as a unified municipality under Alaska state law in 1969, has long been home to members of the Village of Kivalina, a self-governing, federally recognized tribe of Inupiat Native Alaskans. The City of Kivalina has a population of approximately four hundred residents, ninety-seven percent of whom are Alaska Natives.
Kivalina’s survival has been threatened by erosion resulting from wave action and sea storms for several decades. See City of Kivalina, Alaska: Local Hazards Mitigation Plan, Resolution 07-11 (Nov. 9, 2007). The villagers of Kivalina depend on the sea ice that forms on their coastline in the fall, ■winter, and spring each year to shield them from powerful coastal storms. But in recent years, the sea ice has formed later in the year, attached later than usual, broken up earlier than expected, and has been thinner and less extensive in nature. As a result, Kivalina has been heavily impacted by storm waves and surges that are destroying the land where it sits. Massive erosion and the possibility of future storms threaten buildings and critical infrastructure in the city with imminent devastation. If the village is not relocated, it may soon cease to exist.[2]
Kivalina attributes the impending destruction of its land to the effects of glob *854 al warming, which it alleges results in part from emissions of large quantities of greenhouse gases by the Energy Producers. Kivalina describes global warming as occurring through the build-up of carbon dioxide and methane (commonly referred to as “greenhouse gases”) that trap atmospheric heat and thereby increase the temperature of the planet. As the planet heats, the oceans become less adept at removing carbon dioxide from the atmosphere. The increase in surface temperature also causes seawater to expand. Finally, sea levels rise due to elevated temperatures on Earth, which cause the melting of ice caps and glaciers. Kivalina contends that these events are destroying its land by melting the arctic sea ice that formerly protected the village from winter storms.
Kivalina filed this action against the Energy Producers, both individually and collectively, in District Court for the Northern District of California, alleging that the Energy Producers, as substantial contributors to global warming, are responsible for its injuries. Kivalina argued that the Energy Producers’ emissions of carbon dioxide and other greenhouse gases, by contributing to global warming, constitute a substantial and unreasonable interference with public rights, including the rights to use and enjoy public and private property in Kivalina. Kivalina’s complaint also charged the Energy Producers with acting in concert to create, contribute to, and maintain global warming and with conspiring to mislead the public about the science of global warming.
The Energy Producers moved to dismiss the action for lack of subject-matter jurisdiction, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Native Vill. of Kivalina v. ExxonMobil Corp., 663 F.Supp.2d 863, 868 (N.D.Cal.2009). They argued that Kivalina’s allegations raise inherently nonjusticiable political questions because to adjudicate its claims, the court would have to determine the point at which greenhouse gas emissions become excessive without guidance from the political branches. They also asserted that Kivalina lacked Article III standing to raise its claims because Kivalina alleged no facts showing that its injuries are “fairly traceable” to the actions of the Energy Producers.
The district court held that the political question doctrine precluded judicial consideration of Kivalina’s federal public nuisance claim. Id. at 876-77. The court found that there was insufficient guidance as to the principles or standards that should be employed to resolve the claims at issue. Id. at 876. The court also determined that resolution of Kivalina’s nuisance claim would require determining what would have been an acceptable limit on the level of greenhouse gases emitted by the Energy Producers and who should bear the cost of global warming. Id. Both of these issues, the court concluded, were matters more appropriately left for determination by the executive or legislative branch in the first instance. Id. at 877.
The district court also held that Kivalina lacked standing under Article III to bring a public nuisance suit. Id. at 880-82. The court found that Kivalina could not demonstrate either a “substantial likelihood” that defendants’ conduct caused plaintiffs injury nor that the “seed” of its injury could be traced to any of the Energy Producers. Id. at 878-81. The court also concluded that, given the remoteness of its injury claim, Kivalina could not establish that it was within sufficient geographic proximity to the Energy Producers’ alleged “excessive” discharge of greenhouse cases to infer causation. Id. at 881-82. The court declined to exercise supplemental jurisdic *855 tion over the state law claims. Id. at 882-83.
We review a district court’s dismissal for lack of subject-matter jurisdiction de novo. Corrie v. Caterpillar, Inc., 503 F.3d 974, 979 (9th Cir.2007). The dismissal may be affirmed “on any basis fairly supported by the record.” Id. at 979. For the purpose of such rewiew, this Court “must accept as true the factual allegations in the complaint.” Nurse v. United States, 226 F.3d 996, 1000 (9th Cir.2000); see also United States v. Gaubert, 499 U.S. 315, 327, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).
II
A
In contending that greenhouse gases released by the Energy Producers cross state lines and thereby contribute to the global warming that threatens the continued existence of its village, Kivalina seeks to invoke the federal common law of public nuisance. We begin, as the Supreme Court recently did in American Electric Power Co., Inc. v. Connecticut (“AEP”), - U.S. -, 131 S.Ct. 2527, 2535, 180 L.Ed.2d 435 (2011), by addressing first the threshold questions of whether such a theory is viable under federal common law in the first instance and, if so, whether any legislative action has displaced it.
Despite the announced extinction of federal general common law in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the Supreme Court has articulated a “keener understanding” of the actual contours of federal common law. AEP, 131 S.Ct. at 2535. As Justice Ginsburg explained, “[t]he ‘new* federal common law addresses ‘subjects within the national legislative power where Congress has so directed’ or where the basic scheme of the Constitution so demands.” Id. (quoting Friendly, In Praise of Erie — And of the New Federal Common Law, 39 N.Y.U. L. Rev 383, 408 n.119, 421-22 (1964)). Sometimes, Congress acts directly. For example, Congress, in adopting the Employee Retirement Income Security Act (“ERISA”), expected federal courts to develop “a federal common law of rights and obligations under ERISA-regulated plans.” Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). More often, federal common law develops when courts must consider federal questions that are not answered by statutes.
Post-Arie, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution. AEP, 131 S.Ct. at 2535; see also Illinois v. City of Milwaukee (“Milwaukee I”), 406 U.S. 91, 103, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (“When we deal with air and water in their ambient or interstate aspects, there is a federal common law.”) (footnote omitted); Int'l Paper Co. v. Ouellette, 479 U.S. 481, 492, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (“[T]he control of interstate pollution is primarily a matter of federal law.”).
Thus, federal common law can apply to transboundary pollution suits. Most often, as in this case, those suits are founded on a theory of public nuisance. Under federal common law, a public nuisance is defined as an “unreasonable interference with a right common to the general public.” Restatement (Second) of Torts § 821B(1) (1979). A successful public nuisance claim generally requires proof that a defendant’s activity unreasonably interfered with the use or enjoyment of a public right and thereby caused the public-at-large substantial and widespread harm. See Missouri v. Illinois, 200 U.S. 496, 521, 26 S.Ct. 268, 50 L.Ed. 572 (1906) (stating that public nuisance actions “should be of *856 serious magnitude, clearly and fully proved”); Connecticut v. Am. Elec. Power Co., Inc., 582 F.3d 309, 357 (2d Cir.2009), rev’d - U.S. -, 131 S.Ct. 2527, 180 L.Ed.2d 435 (2011) (“The touchstone of a common law public nuisance action is that the harm is widespread, unreasonably interfering with a right common to the general public.”).
B
However, the right to assert a federal common law public nuisance claim has limits. Claims can be brought under federal common law for public nuisance only when the courts are “compelled to consider federal questions which cannot be answered from federal statutes alone.” City of Milwaukee v. Illinois (“Milwaukee II ”), 451 U.S. 304, 314, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (citations and internal quotations omitted). On the other hand, when federal statutes directly answer the federal question, federal common law does not provide a remedy because legislative action has displaced the common law. Federal common law is subject to the paramount authority of Congress. New Jersey v. New York, 283 U.S. 336, 348, 51 S.Ct. 478, 75 L.Ed. 1104 (1931).
If Congress has addressed a federal issue by statute, then there is no gap for federal common law to fill. Milwaukee II, 451 U.S. at 313-14, 101 S.Ct. 1784. “Federal common law is used as a ‘necessary expedient’ when Congress has not ‘spoken to a particular issue.’ ” Cnty. of Oneida, N.Y. v. Oneida Indian Nation of N.Y. State, 470 U.S. 226, 236-37, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (quoting Milwaukee II).
“The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speak[s] directly to [the] question at issue.” AEP, 131 S.Ct. at 2537 (alterations in original) (internal citation and quotation marks omitted). Although plainly stated, application of the test can prove complicated. The existence of laws generally applicable to the question is not sufficient; the applicability of displacement is an issue-specific inquiry. For example, in Milwaukee I, the Supreme Court considered multiple statutes potentially affecting the federal question. 406 U.S. at 101-03, 92 S.Ct. 1385. Concluding that no statute directly addressed the question, the Supreme Court held that the federal common law public nuisance action had not been displaced in that case. Id. at 107, 92 S.Ct. 1385. The salient question is “whether Congress has provided a sufficient legislative solution to the particular [issue] to warrant a conclusion that [the] legislation has occupied the field to the exclusion of federal common law.” Mich. v. U.S. Army Corps of Eng’rs, 667 F.3d 765, 777 (7th Cir.2011). Put more plainly, “how much congressional action is enough?” Id.
C
We need not engage in that complex issue and fact-specific analysis in this case, because we have direct Supreme Court guidance. The Supreme Court has already determined that Congress has directly addressed the issue of domestic greenhouse gas emissions from stationary sources and has therefore displaced federal common law. AEP, 131 S.Ct. at 2530, 2537.
In AEP, eight states, the city of New York, and three private land trusts brought a public nuisance action against “the five largest emitters of carbon dioxide in the United States.” Id. at 2533-34. The AEP plaintiffs alleged that “defendants’ carbon-dioxide emissions created a ‘substantial and unreasonable interference with public rights,’ in violation of the fed *857 eral common law of interstate nuisance,” and sought injunctive relief through a court-ordered imposition of emissions caps. Id. at 2534. Concluding that the Clean Air Act already “provides a means to seek limits on emissions of carbon dioxide from domestic power plants,” the Supreme Court in AEP held “that the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement” of such emissions. Id. at 2537-38.
This case presents the question in a slightly different context. Kivalina does not seek abatement of emissions; rather, Kivalina seeks damages for harm caused by past emissions. However, the Supreme Court has instructed that the type of remedy asserted is not relevant to the applicability of the doctrine of displacement. In Exxon Shipping Co. v. Baker, 554 U.S. 471, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), Exxon asserted that the Clean Water Act preempted the award of maritime punitive damages. Id. at 484, 128 S.Ct. 2605. The Supreme Court disagreed, noting that it had “rejected similar attempts to sever remedies from their causes of action.” Id. at 489, 128 S.Ct. 2605 (citing Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255-56, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)). In Middlesex County Sewerage Authority v. National Sea Clammers Ass’n., 453 U.S. 1, 4, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Supreme Court considered a public nuisance claim of damage to fishing grounds caused by discharges and ocean dumping of sewage. The Court held that the cause of action was displaced, including the damage remedy. Id. at 21-22, 101 S.Ct. 2615. Thus, under current Supreme Court jurisprudence, if a cause of action is displaced, displacement is extended to all remedies.
Certainly, the lack of a federal remedy may be a factor to be considered in determining whether Congress has displaced federal common law. Milwaukee I, 406 U.S. at 103, 92 S.Ct. 1385. But if the federal common law cause of action has been displaced by legislation, that means that “the field has been made the subject of comprehensive legislation” by Congress. Milwaukee II, 451 U.S. at 314, 325, 101 S.Ct. 1784. When Congress has acted to occupy the entire field, that action displaces any previously available federal common law action. Id. Under Exxon and Middlesex, displacement of a federal common law right of action means displacement of remedies. Thus, AEP extinguished Kivalina’s federal common law public nuisance damage action, along with the federal common law public nuisance abatement actions.
The Supreme Court could, of course, modify the Exxon/Middlesex approach to displacement, and will doubtless have the opportunity to do so. But those holdings are consistent with the underlying theory of displacement and causes of action. Judicial power can afford no remedy unless a right that is subject to that power is present. If a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived in another form.
The fact that the damage occurred before the EPA acted to establish greenhouse gas standards does not alter the analysis. The doctrine of displacement is an issue of separation of powers between the judicial and legislative branches, not the judicial and executive branches. Michigan, 667 F.3d at 777. When the Supreme Court concluded that Congress had acted to empower the EPA to regulate greenhouse gas emissions, Massachusetts v. EPA 549 U.S. 497, 528-29, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007), it was a determination that Congress had “spoken *858 directly” to the issue by legislation. Congressional action, not executive action, is the touchstone of displacement analysis. See AEP, 131 S.Ct. at 2537.
Nor does the Supreme Court’s displacement determination pose retroactivity problems. The Supreme Court confronted this theory in the Milwaukee cases, holding in Milwaukee II that amendments to the Clean Water Act, passed after the decision in Milwaukee I, displaced the previously recognized common law nuisance claim because Congress had now “occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency.” Milwaukee II, 451 U.S. at 316, 101 S.Ct. 1784. “[W]hen Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears.” Id. at 314, 101 S.Ct. 1784. Kivalina concedes that its civil conspiracy claim is dependent upon the success of the substantive claim, so it falls as well.
Ill
In sum, the Supreme Court has held that federal common law addressing domestic greenhouse gas emissions has been displaced by Congressional action. That determination displaces federal common law public nuisance actions seeking damages, as well as those actions seeking injunctive relief. The civil conspiracy claim falls with the substantive claim. Therefore, we affirm the judgment of the district court. We need not, and do not, reach any other issue urged by the parties.
Our conclusion obviously does not aid Kivalina, which itself is being displaced by the rising sea. But the solution to Kivalina’s dire circumstance must rest in the hands of the legislative and executive branches of our government, not the federal common law.
AFFIRMED.

. Defendants are: (1) ExxonMobil Corporation; (2) BP P.L.C.; (3) BP America, Inc.; (4) BP Products North America, Inc.; (5) Chevron Corporation; (6) Chevron U.S.A., Inc.; (7) Conocophillips Company; (8) Royal Dutch Shell PLC; (9) Shell Oil Company; (10) Peabody Energy Corporation; (11) The AES Corporation; (12) American Electric Power Company, Inc.; (13) American Electric Power Services Corporation; (14) Duke Energy Corporation; (15) DTE Energy Company; (16) Edison International; (17) Midamerican Energy Holdings Company; (18) Pinnacle West Capital Corporation; (19) The Southern Company; (20) Dynegy Holdings, Inc.; (21) Xcel Energy, Inc.; (22) Genon Energy, Inc.

. "[I]t is believed that the right combination of storm events could flood the entire village at any time.... Remaining on the island ... is no longer a viable option for the community.” U.S. Gov't Accountability Office, GAO 04-142, Alaska Native Villages: Most Are Affected by Flooding and Erosion, but New Qualify for Federal Assistance 30, 32 (2003).