Town of Carrboro v. Duke Energy Corp., 2026 NCBC 13.

STATE OF NORTH CAROLINA

ORANGE COUNTY

THE TOWN OF CARRBORO, NORTH CAROLINA,

Plaintiff,

v.

DUKE ENERGY CORPORATION,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV003385-670

**ORDER AND OPINION ON DEFENDANT DUKE ENERGY CORPORATION'S MOTIONS TO DISMISS**

**THIS MATTER** is before the Court on Defendant Duke Energy Corporation's Motion to Dismiss Under N.C. Rule 12(b)(1) (ECF No. 16) and Motion to Dismiss Under N.C. Rule 12(b)(6) (ECF No. 19) (collectively, "Motions to Dismiss" or the "Motions").

Having considered the Motions, the parties' briefs and other submissions, the arguments of counsel, the applicable law, and all other appropriate matters of record, the Court concludes that the Motion to Dismiss Under Rule 12(b)(1) should be **GRANTED** and the Motion to Dismiss Under Rule 12(b)(6) should be **DISMISSED as MOOT** for the reasons set forth below.

> *Lewis & Roberts, PLLC, by Matthew Quinn and James Roberts, III, for Plaintiff Town of Carrboro, North Carolina.*
>
> *Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP, by Hunter Bruton, Noel Hudson, David Pasley, Shameka Rolla, Amelia Serrat, and Christopher Smith, and Baker Botts L.L.P., by Sterling Marchand and Kent Mayo, for Defendant Duke Energy Corporation.*

Davis, Judge.

## INTRODUCTION

1. It would be a vast understatement to say that this case presents an issue of first impression under North Carolina law. Here, a municipality seeks to hold a public utility company liable for damages resulting from extreme weather events allegedly caused by climate change based on allegations that (1) the company misled the American public for decades about the effects of fossil fuel consumption on the environment; and (2) as a result, the public's transition to alternative forms of energy was delayed. For the reasons set forth below, the Court concludes that this case presents nonjusticiable questions and dismisses the claims asserted by the municipality in their entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact when ruling on a motion to dismiss. Instead, the Court recites or summarizes the allegations asserted in the Complaint that are relevant to its determination of the motion. *See Pridgen v. Carlson*, 2025 NCBC LEXIS 89, at *2 (N.C. Super. Ct. July 25, 2025).

3. Although the Complaint in this case is lengthy, the allegations contained therein can be summarized as follows:

4. Duke Energy Corporation ("Duke Energy") is a Delaware corporation that maintains its principal place of business in Mecklenburg County, North Carolina. (Compl., ECF No. 2, ¶ 19.) Duke Energy is one of the largest electric, natural gas, and energy companies in the world and owns and operates fossil fuel-fired electric plants in a number of states, including North Carolina, South Carolina,

Florida, Indiana, Illinois, Pennsylvania, Ohio, and Tennessee. (Compl. ¶¶ 21, 24, 139.)

5.      As a public utility company, Duke Energy is subject to various federal and state regulations, including those promulgated by the North Carolina Utilities Commission. (*See* Compl. ¶¶ 110, 129–31.)

6.      Plaintiff The Town of Carrboro, North Carolina ("Carrboro") is a municipality existing under Chapter 160A of the North Carolina General Statutes and is located in Orange County, North Carolina. (Compl. ¶ 12.)

7.      Carrboro owns and maintains various public facilities, including roads, sidewalks, curb ramps, fire stations, parks, and recreation facilities. (Compl. ¶¶ 13–17.)

8.      For more than twenty years, Carrboro has taken various actions and enacted policies aimed at reducing its carbon emissions, including, among other things, transitioning to renewable energy sources such as solar power. (Compl. ¶¶ 178–88.)

9.      Despite making "meaningful reductions" to its greenhouse gas emissions, Carrboro alleges that its property has been damaged due to the "adverse impacts of climate change." (Compl. ¶¶ 9, 189, 191.)

10.      For example, Carrboro alleges that heatwaves have caused the asphalt that makes up its eighty-five miles of roadways to soften, thereby causing it to crack under the weight of vehicles. (Compl. ¶ 193.) Furthermore, increased precipitation

has caused Carrboro's roads to crack, develop potholes, and suffer from erosion. (Compl. ¶ 193.)

11. Carrboro also asserts that climate change has contributed to more frequent "extreme weather events," which has required the town to invest increasing amounts of funding to upgrade, maintain, and repair its buildings, parks, and other infrastructure. (Compl. ¶¶ 9, 196, 198–204, 220.)

12. In its Complaint, Carrboro contends that since the 1960s Duke Energy has known about the potential dangers of greenhouse gases (which are emitted as a byproduct of the burning of fossil fuels) far better than the American public. (Compl. ¶¶ 4–5, 47–48, 60, 203–05.)

13. However, rather than informing the public about how greenhouse gas emissions contribute to climate change, Carrboro alleges that Duke Energy has misled the public over the past six decades about the causes and consequences of climate change in order to slow the American public's transition away from fossil fuels and toward renewable energy sources. (Compl. ¶¶ 5, 61, 67, 149.)

14. Carrboro alleges that Duke Energy's wrongful acts have included:

   (a)   Downplaying the danger of fossil fuel emissions, (Compl. ¶¶ 68(a), 68(j), 149(a), 149(j), 252(b));

   (b)   Launching coordinated public relations campaigns to convince the public that fossil fuel emissions were not a serious risk, (Compl. ¶¶ 68(b), 149(b), 252(c));

(c) Advocating inaction to stop or slow climate change, (Compl. ¶¶ 68(c), 149(c), 252(d));

(d) Proposing "false solutions" that would not practically or sufficiently lessen climate change, (Compl. ¶¶ 68(d), 149(d), 252(e));

(e) Opposing efforts to restrict fossil fuel emissions, (Compl. ¶¶ 68(e), 149(e), 252(f), 252(o));

(f) Publicly advocating that decarbonization efforts were unnecessary, uneconomical, or otherwise impractical, (Compl. ¶¶ 68(f), 149(f), 252(g));

(g) Falsely promoting coal-based electricity generation as "clean," (Compl. ¶¶ 68(g), 149(g), 252(h));

(h) Using "fringe" scientists to add a false veneer of credibility to its claims, (Compl. ¶¶ 68(h)–(i), 149(h)–(i), 252(i)–(j));

(i) Promoting its replacement of coal-generated electricity while, in fact, continuing to use equally harmful fossil fuels, (Compl. ¶¶ 68(k), 149(k), 252(l), 252(n)); and

(j) Falsely claiming that transitioning to natural gas would be more climate-friendly, (Compl. ¶¶ 68(l), 149(l), 252(m)).

15. As a result of Duke Energy's alleged disinformation campaign, Carrboro asserts that the American public has continued to rely on the use of fossil fuels and

has been unreasonably and unnecessarily delayed in transitioning toward renewable energy sources. (Compl. ¶¶ 3, 9, 69, 150, 153.)

16. Such delay, Carrboro contends, has materially contributed to climate change and exacerbated the harms of climate change that it has experienced. (Compl. ¶¶ 9–10, 145, 153–54, 160, 191.)

17. Carrboro initiated this lawsuit by filing a Complaint in Orange County Superior Court on 4 December 2024. The Complaint asserts claims for monetary relief against Duke Energy based on common law causes of action for (1) public nuisance, (2) private nuisance, (3) trespass, (4) negligence, and (5) gross negligence.

18. On 14 January 2025, this case was designated as a complex business case pursuant to Rules 2.1 and 2.2 of the General Rules of Practice of the Superior and District Courts and assigned to the undersigned. (ECF No. 1.)

19. Upon the joint motion of the parties, on 10 February 2025, the Court entered an Order staying all discovery in this case and setting deadlines for the parties to file and brief the present Motions. (*See* ECF Nos. 7–9.)

20. On 17 March 2025, Duke Energy filed its Motion to Dismiss under Rule 12(b)(1), and on 9 May 2025, it filed its Motion to Dismiss pursuant to Rule 12(b)(6).

21. The Motions to Dismiss came on for a hearing before the Court on 25 September 2025 at which both parties were represented by counsel.

22. Following the 25 September hearing, the Court directed the parties to submit supplemental briefing on certain issues. (*See* ECF Nos. 27, 30–31.)

23. Having been fully briefed, the Motions are now ripe for resolution.

## LEGAL STANDARD

24. A motion brought under Rule 12(b)(1) challenges a court's jurisdiction over the subject matter of the plaintiff's claims. N.C. R. Civ. P. 12(b)(1). "Subject matter jurisdiction is the indispensable foundation upon which valid judicial decisions rest," *In re T.R.P.*, 360 N.C. 588, 590 (2006), and has been defined as "a court's legal authority to adjudicate the kind of claim alleged." *In re McClatchy Co., LLC*, 386 N.C. 77, 85 (2024) (cleaned up). "[T]he proceedings of a court without jurisdiction of the subject matter are a nullity." *Burgess v. Gibbs*, 262 N.C. 462, 465 (1964) (cleaned up).

25. In determining the existence of subject matter jurisdiction, the Court may consider matters outside the pleadings. *Emory v. Jackson Chapel First Missionary Baptist Church*, 165 N.C. App. 489, 491 (2004). However, "if the trial court confines its evaluation to the pleadings, the court must accept as true the plaintiff's allegations and construe them in the light most favorable to the plaintiff." *Munger v. State*, 202 N.C. App. 404, 410 (2010) (quoting *Dep't of Transp. v. Blue*, 147 N.C. App. 596, 603 (2001)).

## ANALYSIS

26. In support of its Motion to Dismiss Carrboro's claims under Rule 12(b)(1), Duke Energy makes three arguments. First, Duke Energy contends that Carrboro lacks standing under North Carolina law to bring the claims it has asserted in its Complaint. Second, it asserts that Carrboro's claims have been statutorily preempted by federal law as a result of the Clean Air Act and/or by federal common

law.  Third, Duke Energy argues that Carrboro's claims present nonjusticiable issues that are barred by the political question doctrine.

## I.    Standing

27.    "Standing refers to the issue of whether a party has a sufficient stake in an otherwise justiciable controversy that he or she may properly seek adjudication of the matter."  *Creek Pointe Homeowner's Ass'n, Inc. v. Happ*, 146 N.C. App. 159, 165 (2001) (cleaned up).  "As the party invoking jurisdiction, [a] plaintiff[ ] ha[s] the burden of establishing standing."  *Marriott v. Chatham Cnty.*, 187 N.C. App. 491, 494 (2007) (citation omitted).  Because "[s]tanding is a necessary prerequisite to [the] court's proper exercise of subject matter jurisdiction," a motion to dismiss based on a party's lack of standing is properly analyzed under Rule 12(b)(1).  *United Daughters of the Confederacy, N.C. Div., Inc. v. City of Winston-Salem*, 383 N.C. 612, 649–50 (2022) (cleaned up).

28.    Our Supreme Court has recently clarified that "[w]hen a person alleges the infringement of a legal right arising under a cause of action at common law, a statute, or the North Carolina Constitution, . . . the legal injury itself gives rise to standing."  *Soc'y for the Hist. Pres. of the Twenty-Sixth N.C. Troops, Inc. v. City of Asheville*, 385 N.C. 744, 751 (2024) (cleaned up); *see also Mauck v. Cherry Oil Co.*, 388 N.C. 325, 331 (2025); *United Daughters of the Confederacy, N.C. Div., Inc.*, 383 N.C. at 626; *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm. (EPAC)*, 376 N.C. 558, 608 (2021).

29.     In determining whether Carrboro has standing, the Court first notes that our General Assembly has granted North Carolina municipalities broad general corporate powers and rights. Specifically, Chapter 160A of our General Statutes states in relevant part as follows:

> The inhabitants of each city heretofore or hereafter incorporated by act of the General Assembly or by the Municipal Board of Control shall be and remain a municipal corporation by the name specified in the city charter. Under that name *they shall be vested with all of the property and rights in property belonging to the corporation*; shall have perpetual succession; *may sue and be sued*; may contract and be contracted with; may acquire and hold any property, real and personal, devised, sold, or in any manner conveyed, dedicated to, or otherwise acquired by them, and from time to time may hold, invest, sell, or dispose of the same; may have a common seal and alter and renew the same at will; and shall have and may exercise in conformity with the city charter and the general laws of this State all municipal powers, functions, rights, privileges, and immunities of every name and nature whatsoever.

N.C.G.S. § 160A-11 (emphasis added).

30.     By vesting municipalities (such as Carrboro) with such broad authority, our General Assembly has conferred upon them traditional common law rights held by property owners—including the right to file suit to redress harm to that property. *See, e.g., Town of Morganton v. Hudson*, 207 N.C. 360, 362 (1934) (holding that a municipality which was "the owner of [an] easement" to property possessed standing to bring a claim for damage to the property and to "restrain further trespass upon the land").

31.     It is well established that property owners in North Carolina generally possess a common law right to be free from unwanted nuisances and intrusions upon their property and to obtain damages for a violation of that right. *See Farrington v. WV Invs., LLC*, 296 N.C. App. 324, 332, 337 (2024) (holding that a property owner

may bring a claim to remedy " 'unreasonable' property interferences[,]" including unwanted "encroach[ments] onto [their] property"); *BSK Enters., Inc. v. Beroth Oil Co.*, 246 N.C. App. 1, 25 (2016) (concluding that a property owner had standing to remedy "an unreasonable interference with the use and enjoyment of his property[ ]" (cleaned up)).

32.     As a result, the Court concludes that Carrboro possesses standing to bring this action.

## II.     Preemption

33.     Duke Energy also contends that dismissal of this case is proper because Carrboro's claims are preempted by federal law.

34.     It is a "fundamental principle of the Constitution [ ] that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (cleaned up).  As such, Congress may preempt state law explicitly "through express language in a statute[ ]" or implicitly "either through conflict or field preemption." *DTH Media Corp. v. Folt*, 374 N.C. 292, 306 (2020) (cleaned up). However, because "a finding of federal preemption intrudes upon and diminishes the sovereignty accorded to states under our federal system[,]" the trial court's analysis begins "with a presumption against federal preemption." *Id.* (cleaned up).

35.     Courts around the country addressing climate change lawsuits have split on whether such state law claims are barred by the preemption doctrine. *Compare Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 195 (4th Cir. 2022) (holding that state law nuisance, trespass, and negligence claims for "climate-change-

related injuries, including sea level rise and associated impacts, increased frequency and severity of extreme precipitation events, increased severity of drought, increased frequency and severity of heat waves and extreme temperatures, and consequent social and economic injuries" resulting from the defendants' alleged "coordinated, multi-front effort to conceal and deny their own knowledge of those threats" and to "discredit[ ] publicly available scientific evidence" were not barred by the preemption doctrine (cleaned up)) *and Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy USA, Inc.*, 2025 Colo. LEXIS 326, at \*4, \*22 (Colo. 2025) (concluding that state law nuisance and trespass claims for damages resulting from "defendants' production, promotion, refining, marketing, and sale of fossil fuels . . . [which] exacerbate[d] climate change, which in turn, . . . caused harm to Boulder's property and residents[ ]" were "not preempted by either federal common law or the [Clean Air Act]"), *petition for cert. filed*, No. 25-170 (S. Ct. Aug. 8, 2025) *with City of New York. v. Chevron Corp.*, 993 F.3d 81, 87–88, 103 (2d Cir. 2021) (holding that state-law claims for nuisance and trespass based on "the Producers hav[ing] known for decades that their fossil fuel products pose[d] a severe risk to the planet's climate[,] . . . downplay[ing] the risks[,] and continu[ing] to sell massive quantities of fossil fuels, which [ ] caused . . . significant changes to the City's climate and landscape[ ]" were preempted by federal common law and displaced by the Clean Air Act) *and City of Annapolis v. BP PLC*, 2025 Md. Cir. Ct. LEXIS 4, at \*9, \*16 (Md. Cir. Ct. Jan. 23, 2025) (concluding that claims predicated on the defendants' agreement "to conceal and misrepresent the dangers of fossil fuels to consumers and the public; to knowingly withhold material

information regarding the consequences of using fossil fuels; to deceptively obscure the connection between fossil fuel consumption and global warming and the environmental, physical, social, and economic consequences flowing from it; and to promote fossil fuel products despite knowing that doing so would exacerbate climate change" were preempted "possibly by federal common law but surely by the Federal Clean Air Act[ ]").

36. Here, in support of its preemption argument, Duke Energy asserts that one state cannot—consistent with the equal sovereignty granted to its sister states—apply its internal laws to regulate emissions released in another state. Furthermore, Duke Energy contends that Congress has preempted the field of interstate emissions regulation through the enactment of the Clean Air Act, 42 U.S.C. § 7401, *et seq.*, leaving no room for the application of state law to disputes involving interstate emissions.

37. In an effort to avoid preemption concerns, however, Carrboro has materially clarified its theory underlying this lawsuit. Carrboro now maintains that this case is *not* about either the extent of Duke Energy's fossil fuel-related emissions or whether Duke Energy's alleged campaign of deception influenced state or national policymakers to set emissions standards at levels that were environmentally harmful.

38. Instead, Carrboro is relying on a novel theory that can be summarized as follows: (1) for the last several decades, Duke Energy has embarked on a course of conduct intended to deceive the American public about the dangers of fossil fuels; (2)

as a result, the American public at large delayed its transition away from fossil fuels until irreparable harm to the environment had occurred in the form of climate change; and (3) the ensuing effects of that climate change have caused increased storms, including those that damaged Carrboro's municipal property and infrastructure.

39.     In support of this theory, at the 25 September hearing on the Motions, counsel for Carrboro took great pains to distance Carrboro's allegations from the subject of emissions.

> **THE COURT**:     But, for clarity, you are not claiming that the misrepresentations themselves are in Carrboro.   Instead, you are claiming that the misrepresentations led to several other events, and those subsequent events are what harmed Carrboro, correct?
>
> **MR. QUINN**:     I believe that's correct, but, however, with the caveat.  I mean what -- *our allegation is that the deception campaign caused a doubling down on the use of fossil fuels by everybody.  The deception campaign caused a delay to the transition to renewable energy by everybody*, and that has caused these climate changes that Carrboro is particularly susceptible to.  So that's the causation theory, and I just wanted to state it to be super clear about what our theory is.
>
> . . .
>
> **THE COURT**:     And again, my question was: *Who do you claim is deceived?*
>
> **MR. QUINN**:     *The public.  The public.  The public.  The public was deceived into continuing to use fossil fuels, to double down on it.  The public was deceived in the delaying of the transition to renewable energy.  That's who was deceived*[ ] . . . .
>
> . . .
>
> **MR QUINN**:        . . .  And we're not -- we're not before the Court saying, "You know, Your Honor, regulators were deceived."  That's not -- that's not part of our claim.  *It's the public that was deceived.  It's the people who didn't put solar panels on their roofs.  It's -- you know, it's --*

*it's people whose driveways could have been solidified and weatherified [sic] but they weren't and houses could have been solidified and weatherified [sic] and weren't. It's the people who didn't move over to EV transportation because they thought fossil fuels were okay. It's the people who decided, "I can continue doing business with a company that burns coal. That's okay because coal is safe."* It's because that's what they were told. But that was not -- but that is not true. That was not -- that was not the case. So that's the way the deception worked.

**THE COURT**: But *when you say "the public," do you mean literally the billions of users around the world?*

**MR. QUINN**: *Yes. Yes, Your Honor. Yeah, it's -- it's every -- everybody* -- climate change has resulted because fossil fuels are so prolific in our country, and renewable energy is not where it otherwise would be because of Duke Energy's deceptions.

(Tr. at 16, 37–38 (emphasis added).)

40. Later in the hearing, Carrboro's counsel clarified that this lawsuit is actually based solely on the climate change effects resulting from the *American* public being deceived by Duke Energy (as opposed to any deception toward—and subsequent reliance by—persons in other countries).

**MR. QUINN:** . . . Oh, and then finally, on this issue of causation, Duke [Energy] has multiple times said, "Well, people in India and China, were they – were they duped?" *That's not part of our case. Our case talked about America. . . .*

**THE COURT:** How is that logical? I mean we are talking about emissions that go into the atmosphere coupled with weather patterns that are not created by -- by humans. How are we able to discretely cut it off at the borders of the United States?

**MR QUINN:** *Well, because I'm not talking -- when I say that, what I'm talking about is the impact that Duke*[ ] [*Energy's*] *deceptions had on people in America.* And our allegation in the complaint is that Duke[ ] [Energy's] deceptions had a significant, a material impact upon the public's understanding about the realities of the climate crisis and fossil fuels, which caused Americans to change their -- change with -- when it comes to their reliance on fossil fuels and their position on -- on renewable energy.

And then we alleged that as a result of what happened in America, it had a material change on the climate crisis. *So what happened -- when it comes to Duke*[ ] [*Energy's*] *deception and who was fooled, that doesn't have anything to do with somebody in India or somebody in China.*

(Tr. at 176–77 (emphasis added).)

41. Notwithstanding Carrboro's revised legal theory in this case, the possibility remains that at least some portion of its claims are, in fact, federally preempted. *See City of New York*, 993 F.3d at 91 ("Artful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions. It is precisely *because* fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'—that the City is seeking damages." (cleaned up)).

42. Nevertheless, the Court need not decide this issue because Carrboro's claims in this action are clearly nonjusticiable pursuant to the political question doctrine.

### III. Political Question Doctrine

43. The political question doctrine has its origins in the Supreme Court of the United States's decision in *Baker v. Carr* in which the Supreme Court recognized that as "a function of the separation of powers" in our system of government, certain matters are "nonjusticiable" and should be left to the coordinate branches of government. 369 U.S. 186, 210 (1962).

44. The Supreme Court of North Carolina has also recognized the doctrine's potential applicability to claims arising under North Carolina law.

> The political question doctrine controls, essentially, when a question becomes "not justiciable . . . because of the separation of powers provided by the Constitution." *Powell v. McCormack*, 395 U.S. 486, 517 (1969). "The . . . doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill-suited to make such decisions . . . ." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). "It is well established that the . . . courts will not adjudicate political questions." *Powell*, 395 U.S. at 518. A question may be held nonjusticiable under this doctrine if it involves "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker*, 369 U.S. at 217.

*Bacon v. Lee*, 353 N.C. 696, 717 (2001).

45. Our Supreme Court has recently articulated the factors a court must consider in determining whether the doctrine applies and has held that a case presents a nonjusticiable political question "when any one of the following is present: (1) a textually demonstrable commitment of the matter to another branch; (2) a lack of judicially discoverable and manageable standards; or (3) the impossibility of deciding a case without making a policy determination of a kind clearly suited for nonjudicial discretion." *Harper v. Hall*, 384 N.C. 292, 325 (2023).

46. Here, although the second prong of this test most clearly demonstrates that Carrboro's claims are nonjusticiable, all three factors mandate the invocation of the political question doctrine in this case.[1]

---

[1] The Court is acutely aware that the political question doctrine is to be used sparingly by courts. But the doctrine exists for a reason, and its application is appropriate in cases like the present one in which the nature of the claims asserted renders the case nonjusticiable based on one or more of the three factors set out above.

## A. Textual Commitment to Another Branch and Need for Nonjudicial Discretion

47. As an initial matter, it is clear that North Carolina's energy policy is textually committed to branches of government other than the judiciary.

48. Our General Assembly is, of course, tasked with setting public policy for North Carolina. *See Martin v. N.C. Hous. Corp.*, 277 N.C. 29, 41 (1970) (observing that the North Carolina Constitution directs that "questions as to public policy are for legislative determination[ ]" (cleaned up)); *see also Wachovia Bank & Tr. Co. v. Green*, 236 N.C. 654, 659 (1953) ("The public policy of the state is a matter for the legislative branch of the government and not for the courts.").

49. The General Assembly has enacted Chapter 62 of the North Carolina General Statutes, which states in relevant part as follows:

(a) Upon investigation, it has been determined that the rates, services and operations of public utilities as defined herein, are affected with the public interest and that the availability of an adequate and reliable supply of electric power and natural gas to the people, economy and government of North Carolina is a matter of public policy. It is hereby declared to be the policy of the State of North Carolina:

. . .

(5) To encourage and promote harmony between public utilities, their users, and the environment;

. . .

(b) To these ends, therefore, authority shall be vested in the North Carolina Utilities Commission to regulate public utilities generally, their rates, services and operations, and their expansion in relation to long-term energy conservation and management policies and statewide development requirements, and in the manner and in accordance with the policies set forth in this Chapter.

N.C.G.S. §§ 62-2(a)–(b).

50.     N.C.G.S. § 62-31—which is titled "Power to make and enforce rules and regulations for public utilities"—states that "[t]he [Utilities] Commission shall have and exercise full power and authority to administer and enforce the provisions of [Chapter 62], and to make and enforce reasonable and necessary rules and regulations to that end."  N.C.G.S. § 62-31.

51.     In addition, the General Assembly has created a state agency (the Department of Environmental Quality) and tasked it with administering a water and air conservation program along with pollution abatement efforts.

(a)     It is hereby declared to be the public policy of this State to provide for the conservation of its water and air resources.  Furthermore, it is the intent of the General Assembly, within the context of this Article and Articles 21A and 21B of this Chapter, to achieve and to maintain for the citizens of the State a total environment of superior quality.  Recognizing that the water and air resources of the State belong to the people, the General Assembly affirms the State's ultimate responsibility for the preservation and development of these resources in the best interest of all its citizens and declares the prudent utilization of these resources to be essential to the general welfare.

. . .

(c)     It is the purpose of this Article to create an agency which shall administer a program of water and air pollution control and water resource management.  It is the intent of the General Assembly, through the duties and powers defined herein, to confer such authority upon the Department of Environmental Quality as shall be necessary to administer a complete program of water and air conservation, pollution abatement and control and to achieve a coordinated effort of pollution abatement and control with other jurisdictions.  Standards of water and air purity shall be designed to protect human health, to prevent injury to plant and animal life, to prevent damage to public and private property, to insure the continued enjoyment of the natural attractions of the State, to encourage the expansion of employment opportunities, to

> provide a permanent foundation for healthy industrial development and to secure for the people of North Carolina, now and in the future, the beneficial uses of these great natural resources.

N.C.G.S. §§ 143-211(a), (c); *see also* N.C.G.S. § 143-215.106 (granting the Department of Environmental Quality the authority to "administer the air quality program of the State").

52. Through this delegation of authority, the Department of Environmental Quality is empowered to adopt a wide variety of air pollution and emissions regulations, including those applicable to (1) motor vehicles, N.C.G.S. § 143-215.107(a)(6); (2) motor fuel, N.C.G.S. § 143-215.107(a)(9); and (3) investor-owned public utility companies, N.C.G.S. § 143-215.107D.

53. Accordingly, it is clear that issues concerning fossil fuel-related emissions have been delegated to the Utilities Commission and to the Department of Environmental Quality.

54. Moreover, Carrboro's claims in this action beg the question of what emission levels *would* have been appropriate during the time period at issue in order to avoid contributing to irreversible climate change. That is precisely the sort of policy question that requires the exercise of discretion from other branches of our State's government.

B. **Lack of Judicially Discoverable and Manageable Standards**

55. It is axiomatic that courts lack the authority to allocate "power and influence in the absence of . . . legal standards to guide [them] in the exercise of such authority." *Rucho v. Common Cause*, 588 U.S. 684, 721 (2019). Absent such

standards, the judicial power "would be unlimited in scope and duration[ ]" and would give the courts an "extraordinary and unprecedented role." *Id.* at 719.

56. Carrboro contends that because the causes of action it has pled are ones that our courts routinely adjudicate (common law claims for negligence, gross negligence, nuisance, and trespass) this action is necessarily capable of judicial resolution. However, in assessing the justiciability of a particular case, the Court must look beyond the labels attached by a litigant. *See, e.g., Baker*, 369 U.S. at 210–11 ("Much confusion results from the capacity of the 'political question' label to obscure the need for case-by-case inquiry.").

57. Carrboro's assertion ignores the fact that many significant issues regarding climate change are not only the subject of complex scientific debate but also implicate political, economic, and moral choices made by governments and members of the public literally across the globe.

58. Although courts are generally capable of (and are regularly tasked with) adjudicating complex cases involving scientific issues, the present action is of an entirely different dimension—one for which the common law doctrines Carrboro seeks to invoke fail to provide the Court with a manageable framework within which to decide these claims.

59. Although Carrboro attempts to analogize this action to traditional environmental pollution cases, such analogies are inapt. In those lawsuits, distinct lines of causation can be discerned from specifically identified polluters to individual victims. Here, conversely, climate change is non-linear and is the result of the

collective impact of acts by literally billions of unrelated emitters dispersed throughout the globe.

60. Moreover, it is simply impossible to quantify the vast swaths of information received (much less found credible) by these global actors concerning the potential dangers or benefits of fossil fuels and their link to climate change over the course of decades. It is likewise impossible to determine the extent to which the presence—or absence—of such information would have tangibly affected the emission of greenhouse gases or the ensuing acceleration/deceleration of climate change (and its effects).

61. In short, courts lack the capacity to resolve these issues through traditional methods of judicial adjudication. Carrboro's theory in this case would require a factfinder to make decisions based on pure conjecture divorced from any clearly articulable or objective standards, necessarily requiring rank speculation as to the internal motivations of hundreds of millions of individuals in the United States and the cumulative effect of their actions on a global phenomenon. *See DiDonato v. Wortman*, 320 N.C. 423, 430 (1987) ("The law disfavors—and in fact prohibits—recovery for damages based on sheer speculation." (cleaned up)); *see also N.C. Coal. for Isr. v. City of Durham*, 2019 U.S. Dist. LEXIS 236836, at \*14–15 (M.D.N.C. Oct. 18, 2019) (finding that a claim for recovery based on the impact of false statements adopted by the city council would impermissibly "require[ ] speculation into the subjective motives of independent actors who [were] not before the court" to determine "whether the[ ] third-parties [were] acting as a result of [d]efendants'

conduct" (cleaned up)), *report and recommendation adopted*, 2019 U.S. Dist. LEXIS 236835 (M.D.N.C. Nov. 25, 2019), *aff'd per curiam*, 836 Fed. Appx. 183 (4th Cir. 2021).

62. The following is merely a small representative sample of the multitude of unanswerable questions raised by Carrboro's claims and theory of recovery in this case:

- Given that Carrboro is referring to the American public over the past six decades as a singular undifferentiated mass, how can its theory account for the fact that the American public during those decades consisted of hundreds of millions of unrelated individuals—each of whom was an independent decision maker? How can their individual motivations and subjective beliefs be presented to a jury with any semblance of accuracy?

- How many members of the American public were even aware of the allegedly deceptive information provided by Duke Energy over the last six decades? How many of those persons were actually deceived by Duke Energy's representations? How many of them actually made decisions affecting their own individual reliance on fossil fuels based on these deceptions? To what extent were those decisions also influenced by other factors?

- What other sources of information did members of the American public have access to on the subject of fossil fuels and climate change during the decades at issue? To what extent did members of the public make decisions regarding the use of fossil fuels based on some or all of the information they received from those other sources? How specifically did those other sources of information offset (or fail to offset) any deceptive information promulgated by Duke Energy?

- With regard to persons in the United States who were exposed to Duke Energy's allegedly deceptive information and who based their conduct on the validity of that information, did they actually increase their reliance on fossil fuels as a result? If so, to what extent? Or did they merely maintain their then-existing use of fossil fuels?

- Had members of the American public who were exposed to Duke Energy's allegedly deceptive information instead been given accurate information about climate change, would they have

acted differently? If so, how? To what degree would each individual's changed conduct have impacted the overall rate and severity of climate change? Precisely when would any such change in conduct have occurred?

- Absent Duke Energy's alleged misrepresentations, would energy policy or emissions standards in North Carolina or the United States have changed? Without any such regulatory or legislative modifications, what changes could Americans have actually made to their fossil fuel consumption that would have resulted in any appreciable difference in the rate and severity of climate change?

- Would the *global* use of fossil fuels or the cumulative effect of greenhouse gas emissions worldwide have rendered meaningless any changed behavior among certain members of the American public during the decades at issue?

- Had Duke Energy not made the alleged misrepresentations, would other factors (whether natural or manmade) have nevertheless worked to accelerate the rate and severity of climate change?

- What jury instructions could the Court craft that would appropriately describe concepts such as proximate cause and intervening and superseding causes with respect to a subject as scientifically complex as climate change and one that is affected by the actions of billions of actors worldwide?

- How could a jury quantify the degree of harm that Carrboro has suffered that is actually attributable to the personal choices the American public made over the course of six decades based on its collective reliance on Duke Energy's allegedly deceptive statements? How could a jury determine how many members of the American public would have made alternative decisions had they not been deceived by Duke Energy or the extent to which those alternative decisions would have eliminated or minimized the property damage complained of in Carrboro's Complaint?

63. These are only a handful of the many, many questions raised by Carrboro's theory of liability in this case, and they are all questions that no one— including twelve persons sitting in an Orange County jury box in 2026—could even begin to answer.

64.     The ramifications of Carrboro's decision to confine its case to the fossil fuel-related choices made by persons in the United States during these decades bear particular emphasis. It is undeniable that climate change has occurred as a result of immeasurable sources—both man-made and naturally occurring—*that encompass the planet as a whole*. It should go without saying that greenhouse gases do not stop at the borders of nations; instead, climate change is caused by the confluence of emissions that have intermixed and diffused throughout the atmosphere on a global scale with natural weather patterns.

65.     Thus, even putting aside the unknowable issue of precisely how much influence Duke Energy's alleged acts of deception had on energy choices made by individual members of the American public, Carrboro's argument ignores the impacts of fossil fuel-related emissions by billions of persons in other countries throughout the world.

66.     The very nature of carbon emissions—existing as gases that are diffused throughout the atmosphere across the globe—makes any attempt to attribute a specific source of emissions to a specific climate change-related impact a futile endeavor. As the United States Court of Appeals for the Second Circuit has stated:

> Since "[g]reenhouse gases once emitted 'become well mixed in the atmosphere,'" *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011) (quoting Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,514 (Dec. 15, 2009)), "emissions in [New York or] New Jersey may contribute no more to flooding in New York than emissions in China," *id.* (citations omitted); see also J. App'x at 85 ("Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and commingle in the atmosphere. . . .").

*City of New York*, 993 F.3d at 92.

67.     The United States Court of Appeals for the Ninth Circuit has similarly observed this phenomenon:

> But the effect of greenhouse gases on climate is a *global* problem; a discussion in terms of percentages is therefore adequate for greenhouse gas effects. *See* Climate Change Division, Office of Atmospheric Programs, U.S. Environmental Protection Agency, *Technical Support Document for Endangerment and Cause or Contribute Findings for Greenhouse Gases under Section 202(a) of the Clean Air Act 2-3* (2009) (emphasizing the global nature of climate change due to greenhouse gases; explaining that "greenhouse gases, once emitted, become well mixed in the atmosphere, meaning U.S. emissions can affect not only the U.S. population and environment but other regions of the world as well; likewise, emissions in other countries can affect the United States.").

*Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1139 (9th Cir. 2011).

68.     It is also important to emphasize the extent to which Carrboro's claims are fatally imprecise and lacking in concreteness. At the 25 September hearing on the Motions, Carrboro's counsel stated that "our allegation is [ ] that had Duke [Energy] not engaged in these deception campaigns, we would be . . . materially further along in the transition to renewable energy. Now we didn't say in our complaint 'on this date we would be totally there.' . . . [W]hat we alleged is we would be materially further along, and the climate crisis would be much less acute if Duke [Energy] had not engaged in these deceptions." (Tr. at 48.)

69.     It is anything but clear how being "materially further along" in transitioning to renewable energy sources as a general proposition would have prevented Carrboro from suffering storm-related property damage. What *is* crystal clear, however, is the fact that a jury could not make such a determination without engaging in utter conjecture.

70.     The Court finds persuasive the decisions rendered by courts in several other jurisdictions that have similarly found analogous climate change complaints to be nonjusticiable.[2]  The courts' analyses of the political question doctrine in the three cases discussed below aptly demonstrate the absence of judicially manageable standards in climate change lawsuits and how such cases are qualitatively different from traditional environmental pollution cases.

71.     In *Native Village of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd on other grounds*, 696 F.3d 849 (9th Cir. 2012), a federally recognized tribe of Inupiat Eskimo native Americans in Alaska sued various oil companies for erosion to the Kivalina coastline allegedly caused by global warming. 663 F. Supp. 2d at 868–69.  The oil companies moved for dismissal of the tribe's claims under Rule 12(b)(1) of the Federal Rules of Civil Procedure based on, *inter alia*, the application of the political question doctrine.  *Id.*  The district court held that dismissal was, in fact, warranted on that ground in an analysis that applies equally to the present case.

> [The] focus of the second *Baker* factor is not "whether the case is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint.  Rather, courts must ask whether they have the legal tools to reach a ruling that is 'principled, rational, and based upon reasoned distinctions.' " . . .
>
> Plaintiffs contend that "[t]he judicially discoverable and manageable standards here are the same as they are in all nuisance cases." . . .

---

[2] It is well settled that North Carolina courts may consider federal case law and case law from other jurisdictions as persuasive authority.  *See, e.g., Sykes v. Health Network Sols., Inc.*, 2018 NCBC LEXIS 29, at *8 (N.C. Super. Ct. Apr. 5, 2018).

Applying the above-discussed principles here, the fact-finder will have to weigh, *inter alia*, the energy-producing alternatives that were available in the past and consider their respective impact on far ranging issues such as their reliability as an energy source, safety considerations and the impact of the different alternatives on consumers and business at every level. . . . Plaintiffs ignore this aspect of their claim and otherwise fail to articulate any particular judicially discoverable and manageable standards that would guide a factfinder in rendering a decision that is principled, rational, and based upon reasoned distinctions.

Plaintiffs next argue that the existence of judicially discoverable or manageable standards is exemplified by the long, prior history of air and water pollution cases. . . . This Court is not so sanguine. While such principles may provide sufficient guidance in some novel cases, this is not one of them.

The cases cited by Plaintiffs as well as the [*American Electric Power Co.*] court involved nuisance claims founded on environmental injuries far different than those alleged in the instant case. The common thread running through each of those cases is that they involved a discrete number of "polluters" that were identified as causing a specific injury to a specific area. Yet, Plaintiffs themselves concede that considerations involved in the emission of greenhouse gases and the resulting effects of global warming are "entirely different" than those germane to water or air pollution cases. While a water pollution claim typically involves a discrete, geographically definable waterway, Plaintiffs' global warming claim is based on the emission of greenhouse gases from innumerable sources located throughout the world and *affecting the entire planet and its atmosphere.* Notably, Plaintiffs acknowledge that the global warming process involves "common pollutants that are mixed together in the atmosphere [that] cannot be similarly geographically circumscribed."

The sequence of events leading to the claimed injury also is distinguishable. In a water pollution case, the discharge in excess of the amount permitted is presumed harmful. In contrast, the harm from global warming involves a series of events disconnected from the discharge itself. In a global warming scenario, emitted greenhouse gases combine with other gases in the atmosphere which *in turn* results in the planet retaining heat, which *in turn* causes the ice caps to melt and the oceans to rise, which *in turn* causes the Arctic sea ice to melt, which *in turn* allegedly renders Kivalina vulnerable to erosion and deterioration resulting from winter storms.

Despite the admitted and significant distinctions between a nuisance claim based on water or air pollution and one, such as the present, based on global warming, neither Plaintiffs nor [*American Electric Power Co.*] offers any guidance as to precisely what judicially discoverable and manageable standards are to be employed in resolving the claims at issue. Although federal courts undoubtedly are well suited to resolve new and complex issues and cases, the Court is not persuaded that this is such a case. Plaintiffs' global warming nuisance claim seeks to impose liability and damages on a scale unlike any prior environmental pollution case cited by Plaintiffs. Those cases do not provide guidance that would enable the Court to reach a resolution of this case in any "reasoned" manner. Consequently, the Court concludes that application of the second *Baker* factor precludes judicial consideration of Plaintiff[s'] federal nuisance claim.

. . .

Equally problematic for Plaintiffs is the third *Baker* factor, which requires the Court to determine whether it would be impossible for the judiciary to decide the case "without an initial policy determination of the kind clearly for nonjudicial discretion." . . .

Plaintiffs emphasize that because they are not seeking injunctive relief, there is no need for the Court to delve into the task of retroactively determining what emission limits *should have* been imposed. This argument rests on the same faulty logic discussed above; to wit, that Plaintiffs' nuisance claim can be resolved solely by examining the reasonableness of the harm, while avoiding any consideration of the conduct causing the nuisance. . . .

. . .

Plaintiffs also fail to confront the fact that resolution of their nuisance claim requires the judiciary to make a policy decision about *who* should bear the cost of global warming. Though alleging that Defendants are responsible for a "substantial portion of greenhouse gas emissions, Plaintiffs also acknowledge that virtually everyone on Earth is responsible on some level for contributing to such emissions. Yet, by pressing this lawsuit, Plaintiffs are in effect asking this Court to make a political judgment that the two dozen Defendants named in this action should be the only ones to bear the cost of contributing to global warming. Plaintiffs respond that Defendants *should be* the ones held responsible for damaging Kivalina allegedly because "they are responsible for more of the problem than anyone else in the nation . . . ." But even if that were true, Plaintiffs ignore that the allocation of fault—

and cost—of global warming is a matter appropriately left for determination by the executive or legislative branch in the first instance. The Court thus concludes that the third *Baker* factor also militates in favor of dismissal.

*Id*. at 873–77 (cleaned up).

72. In *California v. General Motors Corp.*, 2007 U.S. Dist. LEXIS 68547 (N.D. Cal. Sept. 17, 2007), the State of California sued various automotive manufacturers for creating a public nuisance resulting from their contributions to global warming. 2007 U.S. Dist. LEXIS 68547, at *2. California sought to hold the automative manufacturers liable for funds that the State had spent "to study, plan for, monitor, and respond to impacts already caused, and likely to occur, as a result of global warming[,]" specifically including "increased risk of flooding[,]" "increased erosion" along the State's coastline, and "increases in the frequency and duration of extreme heat events" such as wildfires. *Id*. at *2–4. The district court granted the defendants' motion to dismiss based on the application of the political question doctrine, stating as follows with respect to the lack of judicially manageable standards:

> The crux of this inquiry is not whether the case is unmanageable in the sense of being large, complicated, or otherwise difficult to tackle from a logistical standpoint. Rather, courts must ask whether they have the legal tools to reach a ruling that is "principled, rational, and based upon reasoned distinctions."
>
> In support of its argument that the legal framework is well-established, Plaintiff cites a number of trans-boundary nuisance cases. However, a review of these decisions reveals that the cases are legally, and factually, distinguishable in important respects.
>
> . . .

. . . [T]he cases cited by Plaintiff do not provide the Court with [a] legal framework or applicable standards upon which to allocate fault or damages, if any, in this case. The Court is left without guidance in determining what is an unreasonable contribution to the sum of carbon dioxide in the Earth's atmosphere, or in determining who should bear the costs associated with the global climate change that admittedly result[s] from multiple sources around the globe. Plaintiff has failed to provide convincing legal authority to support its proposition that the legal framework for assessing global warming nuisance damages is well-established.

Factually, Plaintiff's cases are distinguishable because none of the pollution-as-public-nuisance cases implicate[ ] a comparable number of national and international policy issues. . . . In this case, Plaintiff's global war[m]ing nuisance tort claim seeks to impose damages on a much larger and unprecedented scale by grounding the claim in pollution originating both within, and well beyond, the borders of the State of California. Unlike the equitable standards available in Plaintiff[']s cited cases, here the Court is left without a manageable method of discerning the entities that are creating and contributing to the alleged nuisance. In this case, there are multiple worldwide sources of atmospheric warming across myriad industries and multiple countries.

"Were judges to resolve political questions, there would be no check on their resolutions because the Judiciary is not accountable to any other branch or to the People. Thus, when cases present political questions, 'judicial review would be inconsistent with the Framers' insistence that our system be one of checks and balances.'" For these reasons, the Court finds that this *Baker* indicator is inextricable from the current case and that there is a lack of judicially discoverable or manageable standards by which to properly adjudicate Plaintiff's federal common law global war[m]ing nuisance claim.

Because each of the identified *Baker* indicators is inextricable from Plaintiff[']s federal common law global war[m]ing nuisance claim, the Court finds that the claim presents a non-justiciable political question[.]

*Id.* at *44–48 (cleaned up).

73.    Finally, a court in South Carolina recently addressed similar issues in

*City of Charleston v. Brabham Oil Co.*, 2025 S.C. C.P. LEXIS 189 (S.C. Ct. C.P. Aug.

6, 2025). In that case, the City of Charleston brought various state law tort claims

against several oil companies, alleging that their "production, distribution, and sale of fossil fuels, combined with [their] allegedly deceptive public-relations and lobbying activities, render[ed] [them] liable for [the City's] alleged climate change-related injuries—increased flooding, more damaging storms, higher temperatures, and disruption of its ecosystems." *Id.* at \*10–11. In holding that the claims were nonjusticiable, the court explained why it was not equipped to adjudicate the City's claims and how the City's analogy to traditional mass tort litigation was inapt.

> Plaintiff is incorrect that its claims resemble those in other mass-tort lawsuits concerning tobacco, opioids, and per- and polyfluoroalkyl substances ("PFAS"). Those cases involve fundamentally different claims. *First*, the in-state injuries in the tobacco, opioid, and PFAS litigation allegedly arose directly from the in-state consumers' use of those products. A plaintiff smoking tobacco in South Carolina causes direct adverse health effects to that plaintiff in South Carolina. The City's claims, by contrast, depend on interstate and international emissions allegedly causing global climate change, ultimately resulting in alleged in-state injuries caused by, for example, the weather. . . .
>
> . . .
>
> Plaintiff's claims are barred by the political-question doctrine, which applies to "questions that are exclusively or predominantly political in nature rather than judicial." . . .
>
> *First*, "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector" raises "questions of national or international policy" that require an "informed assessment of competing interests." Courts lack "the scientific, economic, and technological resources" to address these issues. . . .
>
> *Second*, the balancing of various public interests required by Plaintiff's claims would require this Court to make sensitive policy determinations meant for nonjudicial discretion.

*Id.* at \*27–28, 39–40; *see also Juliana v. United States*, 947 F.3d 1159, 1172–73 (9th Cir. 2020) (noting that quantifying a specific policy's impact on climate change is

"delicate, complex, and involve[s] large elements of prophecy[,]" making it inappropriate for judicial determination).

74. The above-quoted analyses from those cases are fully applicable here in demonstrating the nonjusticiable nature of Carrboro's claims.

75. For all of these reasons, the Court concludes that Carrboro has asserted claims that are barred by the political question doctrine and therefore must be dismissed.

## CONCLUSION

**THEREFORE, IT IS ORDERED** as follows:

1. Defendant Duke Energy Corporation's Motion to Dismiss pursuant to Rule 12(b)(1) is **GRANTED**, and this action is **DISMISSED** in its entirety; and

2. Defendant Duke Energy Corporation's Motion to Dismiss pursuant to Rule 12(b)(6) is **DISMISSED as MOOT**.

**SO ORDERED**, this the 12th day of February 2026.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases